315 F.3d 1192
 In re JAN WEILERT RV, INC., Debtor,
Ganis Credit Corporation, Appellant,
v.
Karl T. Anderson, Trustee, Appellee.
In re Jan Weilert RV, Inc., Debtor,
Bank of the West, Appellant,
v.
Karl T. Anderson, Appellee.
 No. 01-55455.
 No. 01-56872.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 9, 2002.
 Filed January 13, 2003.
 
 John J. Bingham, Jr., Danning, Gill, Diamond & Killitz, LLP, Los Angeles, CA, for the appellee-plaintiff.
 John A. Hendry, South Pasadena, CA, for appellant-defendant Ganis Credit Corporation.
 Dave M. McGraw, Walnut Creek, CA, for appellant-defendant Bank of the West.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel; Perris, Brandt and Montali, Bankruptcy Judges, Presiding. BAP No. CC-00-01110-PBMo.
 Appeal from the United States District Court for the Central District of California; Robert J. Timlin, District Judge, Presiding. D.C. No. CV-00-00086-RJT.
 Before REINHARDT, TROTT and SILVERMAN, Circuit Judges.
 OPINION
 TROTT, Circuit Judge.
 
 
 1
 In this consolidated opinion we address the separate appeals of Ganis Credit Corp. ("Ganis") and Bank of the West. Their cases arose in the bankruptcy proceedings of Jan Weilert R.V., Inc. ("Debtor") before the United States Bankruptcy Court for the Central District of California. The bankruptcy court issued a consolidated opinion holding that Debtor's two payments to Ganis and two payments to Bank of the West were avoidable as preferential transfers under 11 U.S.C. § 547(b), and not made in the ordinary course of business under § 547(c)(2). Anderson v. Ganis Credit Corp. (In re Jan Weilert R.V., Inc.), 245 B.R. 377, 388-89 (Bankr.C.D.Cal. 2000). Ganis first appealed to the Ninth Circuit Bankruptcy Appellate Panel ("BAP"), and Bank of the West first appealed to the U.S. District Court for the Central District of California.
 
 
 2
 Ganis now appeals from the BAP's decision affirming the bankruptcy court's decision that the lien payoffs of two trade-in vehicles were not made according to ordinary business terms as required by § 547(c)(2)(C). We reverse. The bankruptcy court's findings as applied to trade-ins are erroneously limited to the average transaction in the industry rather than encompassing the broad range of practices that are not unusual in the industry.
 
 
 3
 Bank of the West appeals from the district court's decision (1) affirming the bankruptcy court's finding that the lien pay-off of a consignment vehicle was not made according to ordinary business terms, and (2) reversing the bankruptcy court's finding that the refund of a mistaken double payment with regard to the financed sale of a new vehicle was made according to ordinary business terms. We affirm the district courts' holding as to the consignment payoff, however, we reverse the district court as to the refund payment, and hold that no further evidence of industry practices was required.
 
 
 4
 * BACKGROUND
 
 
 5
 Debtor was a dealer in new and used recreational vehicles ("RV's"). As part of its business, Debtor accepted used RV's as trade-ins for resale. Debtor entered also into consignment agreements whereby it sold used RV's for their owners. The trade-in and consignment vehicles involved in this case were subject to perfected security interests held by lenders Ganis and Bank of the West, who had financed the vehicles' original purchases. Debtor petitioned for a Chapter 11 bankruptcy on April 4, 1997, which was converted to Chapter 7 on September 10, 1997. Appellee Karl T. Anderson ("Trustee") is the Chapter 7 trustee.
 
 A. Trade-in Payoffs to Ganis
 
 6
 Ganis held a perfected security interest in an RV owned by Clyde Wilson, who traded-in the RV to Debtor on November 26, 1996. Debtor resold the RV on January 30, 1997, and received the proceeds of the sale that same day. Debtor's payment of $37,005.33 to Ganis, in full satisfaction of its lien, cleared Debtor's account on February 20, twenty-one days after the resale.
 
 
 7
 Ganis held also a perfected security interest in an RV owned by Mr. Springer, who traded-in the RV to Debtor on January 27, 1997. Debtor resold the RV on February 6, 1997, and received the proceeds of the sale that same day. Debtor's payment of $11,299.26 to Ganis, again in full satisfaction of its lien, cleared Debtor's account on March 19, 1997, forty-one days after the resale.
 
 B. Consignment Payoff to Bank of the West
 
 8
 Bank of the West held a perfected security interest in an RV owned by Raymond Deeds, who delivered the RV to Debtor to sell under a consignment agreement. Debtor sold the RV on November 19, 1996, and received the proceeds of the sale that same day. Per the agreement with Deeds, Debtor delivered a check in the amount of $44,271.72 to Bank of the West in full satisfaction of its lien, but did not send it until January 8, 1997. The payment cleared Debtor's account on January 14, fifty-six days after the sale.
 
 C. Refund Payment to Bank of the West
 
 9
 The final transaction did not involve a consigned or traded-in RV, but arose after Debtor sold a new RV to Barbara Jones. Bank of the West financed the sale for Jones and mailed a cashier's check to Debtor in the amount of $42,280.79 on January 3, 1997. Then on January 7, Bank of the West mistakenly made a second payment — a direct deposit of $42,280.79 — into Debtor's account. Bank of the West almost immediately discovered the error, contacted Debtor, and requested a refund of the second payment. On January 10, Debtor issued a check to Bank of the West in the amount of $42,280.79 as a refund.
 
 D. Proceedings in the Lower Courts
 
 10
 The Trustee brought adversary proceedings against Ganis and Bank of the West under § 547(b) to avoid the three lien payoffs and the refund payment as preferential transfers. After granting summary judgment against both defendants on all the elements of § 547(b) and on the "contemporaneous exchange for new value" ("new value") defense, § 547(c)(1), the bankruptcy court held separate trials on the issue of whether the transfers were made in the ordinary course of business (or "ordinary course") pursuant to § 547(c)(2). If so made, these transfers would not have been avoidable. After the trials, the bankruptcy court issued a published combined opinion, taking judicial notice of the evidence presented in both cases. Anderson, 245 B.R. at 379 n. 1.
 
 
 11
 The bankruptcy court focused on § 547(c)(2)(C), the "ordinary business terms" prong of the ordinary course defense. The court found the testimony of David Russell ("Russell"), a Bank of the West vice-president and former RV dealer, to be most persuasive on the issue of lien payoff practices among RV dealers and lenders. Id. at 383. Ultimately, the court found that the payoffs "would meet the ordinary course standard [1] if payoff is within 45 days of trade-in or, [2] if payoff is within 20 days of receipt of funds from the third party purchaser," and described the test as giving creditors "two bites at the apple." Id. at 389. The bankruptcy court found that neither the trade-in nor consignment payoffs fit within either time frame and ordered Ganis and Bank of the West to return the funds to the Trustee. Both the district court and the BAP, in a published decision, affirmed the lien payoff findings and conclusions.[1] Ganis Credit Corp. v. Anderson (In re Jan Weilert R. V., Inc.), 258 B.R. 1, 7 (9th Cir.BAP 2001).
 
 
 12
 Regarding the refund payment on the new RV, the only witness to testify on "ordinary course of business" was Pamela Norton, a Bank of the West vice-president. Norton described Bank of the West's procedures for recovering double payments but provided no testimony on procedures followed by other lenders. Bank of the West argued that no additional evidence was necessary because no industry standard could be more stringent than immediate demand and repayment within three days. The bankruptcy court found the transfer to be within the ordinary course of business. The district court, however, reversed the finding on Trustee's cross-appeal, holding that Bank of the West failed to produce "evidence of the standard practices other lenders in the industry use to recover double payments."
 
 
 13
 Ganis and Bank of the West both timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 158(d). We reverse the BAP, and we affirm in part and reverse in part the district court.
 
 II
 STANDARD OF REVIEW
 
 14
 This court independently reviews the bankruptcy court's rulings on appeal from either the BAP or the district court. In re Su, 290 F.3d 1140, 1142 (9th Cir. 2002) (BAP appeal); Preblich v. Battley, 181 F.3d 1048, 1051 (9th Cir.1999) (district court appeal) ("We independently review the bankruptcy court's decision and do not give deference to the district court's determinations"). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. In re Su, 290 F.3d at 1142. This court must accept the bankruptcy court's findings of fact unless upon review we are left with the definite and firm conviction that a mistake has been committed. In re Banks, 263 F.3d 862, 869 (9th Cir.2001). A determination of whether a transaction falls outside the ordinary course of business is a question of fact that depends on the nature of industry practice. Arrow Electronics, Inc. v. Justus (In re Kaypro), 218 F.3d 1070, 1073 (9th Cir.2000).
 
 III
 THE ORDINARY COURSE OF BUSINESS EXCEPTION
 
 15
 We are asked to decide whether the bankruptcy court erred in holding that the transfers to Ganis and Bank of the West were not made in the ordinary course of business under § 547(c)(2), or more specifically, that they were not made according to ordinary business terms under § 547(c)(2)(C).
 
 
 16
 A debtor may not "prefer" one creditor over another by selecting to pay one but not the other during the debtor's slide into bankruptcy. "The preference rule aims to ensure that creditors are treated equitably based on the theory that `[u]nless the favoring of particular creditors is outlawed, the mass of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable.'" Luper v. Columbia Gas of Ohio, Inc. (In re Carled), 91 F.3d 811, 815 (6th Cir.1996) (quoting In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032 (7th Cir.1993) (citations omitted)).
 
 
 17
 Trustees are allowed to challenge certain transfers under § 547(b), and recover the funds for proper distribution among all the debtor's creditors.
 
 
 18
 To avoid a transfer under 11 U.S.C. § 547(b), the trustee must prove by a preponderance that the transfer was (1) made to or for the benefit of a creditor, (2) on account of an antecedent debt, (3) made while the debtor was insolvent, and (4) made within one year of the petition, and (5) enabled the creditor to receive more than it would have had the transfer not been made and the case liquidated pursuant to the provisions of chapter 7 of the bankruptcy code.
 
 
 19
 In re Kaypro, 218 F.3d at 1073 (citation omitted).
 
 
 20
 Once the trustee proves his prima facie case under § 547(b), the creditor may raise one of the defenses set out in § 547(c). Under the ordinary course of business defense, § 547(c)(2), a trustee may not avoid a transfer to the extent the transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms. "The [ordinary course] exception deter[s] the race to the courthouse and enabl[es] the struggling debtor to continue operating its business.'" In re Kaypro, 218 F.3d at 1073 n. 3 (quoting Union Bank v. Wolas, 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (internal quotation marks omitted)).
 
 
 21
 This court has interpreted the "ordinary business terms" prong ("subsection C") to mean that the payment must be "ordinary in relation to prevailing business standards." In re Food Catering & Hous., Inc., 971 F.2d 396, 398 (9th Cir.1992). More recently, this Court stated that "to apply Section 547(c)(2)(C), the court must look to `those terms employed by similarly situated debtors and creditors facing the same or similar problems. If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry.'" In re Kaypro, 218 F.3d at 1074 (quoting Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 42 (2d Cir. 1996)).
 
 
 22
 This court's standard regarding subsection C is consistent with those of other circuit courts. In the leading case, the Seventh Circuit held:
 
 
 23
 [T]he creditor must show that the payment he received was made in accordance with the ordinary business terms in the industry. But this does not mean that the creditor must establish the existence of some single, uniform set of business terms.... We conclude that `ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.
 
 
 24
 In re Tolona Pizza, 3 F.3d at 1033 (emphasis in original).
 
 
 25
 Most of the circuit courts have adopted some form of the Tolona Pizza standard. See In re Roblin Indus., 78 F.3d at 42 (Second Circuit adopting the reasoning of Tolona Pizza and including terms that are normal for industry participants under financial distress); Fiber-Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.), 18 F.3d 217, 224-25 (3d Cir.1994) (substituting the word "unusual" for "idiosyncratic" and allowing a sliding scale approach between subsections B and C based on the length of the relationship between the debtor and creditor); Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1050 (4th Cir.1994) (adopting Tolona Pizza as modified in Molded Acoustical); In re Carled, 91 F.3d at 818 (Sixth Circuit holding that "`ordinary business terms' means that the transaction was not so unusual as to render it an aberration in the relevant industry"); Jones v. United Sav. and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Inc.), 9 F.3d 680, 685 (8th Cir.1993) (substituting "unusual" for "idiosyncratic").
 
 
 26
 Thus, although in applying § 547(c)(2)(C) "the court must look to those terms employed by similarly situated debtors and creditors facing the same or similar problems," creditors are not required to prove a particular uniform set of business terms, rather, "ordinary business terms" refers to the broad range of terms that encompasses the practices employed by those debtors and creditors, including terms that are ordinary for those under financial distress. See In re Kaypro, 218 F.3d at 1074; Tolona Pizza, 3 F.3d at 1033. Only a transaction that is so unusual or uncommon "as to render it an aberration in the relevant industry," In re Carled, 91 F.3d at 818, falls outside the broad range of terms encompassed by the meaning of "ordinary business terms."
 
 IV
 RV LIEN PAYOFFS
 A. Trade-in Payoffs to Ganis
 
 27
 The bankruptcy court's findings that the payoffs "would meet the ordinary course standard [1] if payoff is within 45 days of trade-in or, [2] if payoff is within 20 days of receipt of funds from the third party purchaser," Anderson, 245 B.R. at 389, provide creditors with two opportunities to prove a lien payoff was made according to ordinary business terms. We need only address the second "bite at the apple." Id.
 
 
 28
 The testimony cited by the bankruptcy court certainly places "20 days" within the "broad range of terms" encompassed by subsection C. This testimony, however, does not support a finding that the "broad range" must be limited to twenty days when the payoff is for a trade-in.[2] Indeed, Russell testified that "a lender would not come on the [dealer's] lot and pick up the unit because of non-payment by the customer," and that "dealers will wait as long as possible to make a lien payoff to the lender." Id. at 383. Specifically regarding trade-ins, Russell testified that "the time it takes to pay off a lienholder from the time the trade-in vehicle was sold to a third party, may take from one to 45 days," and that "the average, or mean time, was probably 20 days." Id. at 384 (emphasis added). Thus the "broad range" of terms supported by the testimony encompasses payoffs made between one and forty-five days after resale, but the bankruptcy court's findings limited "ordinary business terms" to the average twenty-day transaction. This was a mistake.
 
 
 29
 The bankruptcy court's findings are nearly identical to findings rejected by the Sixth Circuit in In re Carled, 91 F.3d at 818. There, the Sixth Circuit rejected the district court's definition of "ordinary business terms" which required the transaction to resemble a majority of the industry's transactions, and reversed the bankruptcy court's conclusion that in order for a late payment to meet ordinary business standards the creditor must establish lateness as a pattern for a significant percentage of specific customers. Id.
 
 
 30
 We see no difference between the "majority of transactions" standard rejected by the Sixth circuit and the standard applied by the bankruptcy court in this case. Like the district court in Carled, the bankruptcy court improperly limited the scope of "ordinary business terms" to the average transaction. Such a limitation is inconsistent with "the clear consensus among the courts of appeals," id., because it fails to encompass the "broad range of terms that encompasses the practices employed" by "similarly situated debtors and creditors facing the same or similar problems," supra. Normally, we would remand a case to the bankruptcy court when it has applied an incorrect legal standard, nevertheless, "we need not remand if the record permits of only one resolution of the issue." In re Molded Acoustical Prods., 18 F.3d at 222 n. 7.
 
 
 31
 The challenged payoffs to Ganis cleared Debtor's bank account 21 days and 41 days after their respective sales, placing both payments within the "one to 45-days" range of practices employed by similarly situated debtors and creditors, the only range of terms supported by the testimony.
 
 B. Consignment Payoff to Bank of the West
 
 32
 Bank of the West presented only one argument relevant to the consignment payoff in its principal brief on appeal, that the proceeds from the sale of the consigned RV were "ear-marked" for payment to Bank of the West, and thus not subject to avoidance.[3] The principal rationales supporting the earmarking doctrine are (1) the transferred funds were not property of the debtor, and (2) there was no diminution of the bankruptcy estate. In re Superior Stamp & Coin Co., 223 F.3d 1004, 1008 (9th Cir.2000) (emphasis added). We need not describe further the details of the earmarking doctrine in this case, however, because the "earmarking" argument was not raised in the bankruptcy court. Indeed, on the first day of trial Bank of the West asserted that the funds used to pay-off the lien were the Debtor's property, a position that is incompatible with an "earmarking" argument. Id. Absent exceptional circumstances, this court generally will not consider arguments raised for the first time on appeal. In re Am. West Airlines, 217 F.3d 1161, 1165 (9th Cir. 2000). We see no exceptional circumstances which prevented Bank of the West from raising earmarking in the bankruptcy court, and we will not entertain this argument here. Thus, we affirm the bankruptcy courts' conclusion that the consignment payoff was an avoidable transfer.
 
 V
 REFUND PAYMENT
 
 33
 Finally, we address whether the district court erred in reversing the bankruptcy court's conclusion that the refund payment was made in the ordinary course of business. The district court reversed the bankruptcy court on the ground that under § 547(c)(2)(C), Bank of the West was required to produce "evidence of the standard practices other lenders in the industry use to recover double payments," which Bank of the West did not do. However, we agree with the bankruptcy court that no further evidence was required in this case.
 
 
 34
 There is no dispute that on January 7, 1997, Bank of the West mistakenly deposited funds into the Debtor's bank account and that the mistake was quickly discovered. Likewise, there is no dispute that Bank of the West immediately demanded repayment, which was tendered by Debtor on January 10, only three days after the mistaken transfer. At trial, testimony was presented that the recovery was accomplished according to procedures Bank of the West had established for recovering such payments. Bank of the West argued, then and now, that no further evidence of industry standards was necessary in this case for the court to conclude that the transfer was "made according to ordinary business terms" because no standard could be so stringent as to exclude the refund of a mistaken double payment within three days.
 
 
 35
 As we have held, "to apply Section 547(c)(2)(C), the court must look to `those terms employed by similarly situated debtors and creditors facing the same or similar problems.'" In re Kaypro, 218 F.3d at 1074 (citation omitted). While we hold to the rule that evidence as to the range of industry practice is ordinarily required, the problem of refunds of mistaken payments is exceptional. Like all recipients of mistaken payments, Bank of the West was subject to a legal obligation promptly to refund the money. It fulfilled this obligation by issuing a refund check within three days, which would clearly have fallen within the ordinary range no matter what the relevant industry or practice. Here, the "ordinariness" of the Bank's compliance with its legal obligation is obvious, and additional evidence of industry practice could not have assisted the court in recognizing that the refund was "made according to ordinary business terms." The law does not inflexibly demand form over substance.
 
 
 36
 In sum, additional evidence of industry standards is not necessary under § 547(c)(2)(C), when the transferee can prove that (1) money was mistakenly transferred to the debtor, (2) the mistake was quickly discovered, (3) a refund was immediately requested, and (4) the refund was tendered within three days. Thus, additional evidence of industry standards was not required to prove that Debtor's refund payment to Bank of the West was "made according to ordinary business terms."
 
 CONCLUSION
 
 37
 Under § 547(c)(2)(C) a court cannot limit "ordinary business terms" to the "average" transactions in the industry, but must consider the broad range of terms that encompasses the practices employed by similarly situated debtors and creditors facing the same or similar problems. Thus, we reverse the bankruptcy court's holdings that the transfers to Ganis were not made in the ordinary course of business. However, the standard we find applicable to trade-in vehicles does not necessarily apply to consignment vehicles, which could easily fall under a different standard. Because no argument was properly presented on the issue, however, we affirm the bankruptcy courts' conclusion that the lien payoff to Bank of the West was a preferential transfer.
 
 
 38
 Finally, the refund payment to Bank of the West was made in the ordinary course of business. The refund tendered within three days of the mistaken transfer is obviously ordinary and no industry standard could be so narrow as to exclude it. Thus, additional evidence of the particular industry standard was not required.
 
 
 39
 The decision of the BAP in Ganis's case (01-55455) is REVERSED.
 
 
 40
 The decision of the district court in Bank of the West's case (01-56872) is REVERSED in part, and AFFIRMED in part. The parties in Bank of the West's case shall bear their own costs of this appeal.
 
 
 
 Notes:
 
 
 [1]
 Both the BAP and the district court rejected a "reasonable creditor" standard formulated by the bankruptcy court requiring lenders to inquire within 45 days after a vehicle's trade-in as to why payment had not been received as part of the ordinary course of business. The evidence showed that lenders do not actually conduct such inquiries, thus, the BAP and the district court held that the bankruptcy court erred in requiring them under the ordinary course defenseSee In re Weilert, 258 B.R. at 7. Despite their rejection of the standard, both the BAP and the district court held that the 45-day prong of the bankruptcy court's test was supported by the evidence. Our disposition of this case does not require us to address the "reasonable creditor" standard, thus, the rejection of that standard remains in force.
 
 
 [2]
 Russell testified that the payoff ofconsigned vehicles was ordinarily made within 20 days of sale because DMV regulations required it, however, the payoffs to Ganis were for trade-ins. Another key difference between consignments and trade-ins is that a dealer receives ownership documents for a trade-in at the time it is traded in, whereas the dealer never owns a consignment vehicle, but obtains the ownership documents only briefly to facilitate the transfer to the new buyer.
 
 
 [3]
 Bank of the West identified nine other issues relevant to the consignment payoff, six of which were not argued at all. Issues raised in the appellate brief, but not supported by argument, are deemed abandonedLeer v. Murphy, 844 F.2d 628, 634 (9th Cir.1988); see Fed.R.App.P. 28(a)(9) (appellants' brief must contain "appellants' contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Bank of the West argued the "new value" defense, but only in its reply brief and, again, without citations to supporting authority. In addition to the failure to comply with Fed.R.App.P. 28(a)(9), appellants cannot raise an issue for the first time on appeal in a reply brief. Northwest Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d 918, 924 (9th Cir.1988).