**In re HESSCO INDUSTRIES, INC., Debtor.**

**Weneta Kosmala, Chapter 7 Trustee, and Weinstein, Eisen, and Weiss, Appellants,**

**v.**

**Hans Imhof, individually; Hans Imhof, as Trustee of the Imhof Family Trust; and Steve Hess, Appellees.**

BAP No. CC–01–1559–BMoP.
Bankruptcy No. SA 93–24006–JB.
Adversary No. SA 95–02459–JB.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

May 30, 2003.

Deborah H. Eisen, Weinstein, Eisen, Weiss & Rothschild, LLP, Los Angeles, CA, for Weneta A. Kosmala, Ch. 7 Trustee.

Michael R. Pfeifer, Pfeifer & Reynolds, Santa Ana, CA, for Hans Imhof; Imhof Family Trust.

Before BRANDT, MONTALI, and PERRIS, Bankruptcy Judges.

## ORDER DENYING MOTION FOR REHEARING

BRANDT, Bankruptcy Judge.

This appeal was argued 23 October 2002 and a memorandum decision filed 2 December 2002 reversing the bankruptcy court's judgment for defendants on the trustee's adversary complaint seeking avoidance and recovery of preferential transfers. In a separate published order, also filed on that date, we agreed to hear

the trustee's law firm's challenge to the bankruptcy court's order awarding discovery sanctions to appellees, notwithstanding the firm's failure to file a notice of appeal.

## I.  FACTS

For convenience, we restate[1] the facts from our prior memorandum: beginning in 1975, debtor Hessco Industries, Inc. ("Hessco") manufactured fiberglass tubs and showers for sale to builders, developers, and contractors, at its plant in La Habra, California. In 1984, Hessco purchased 15 acres of real property and a 66,000–square–foot manufacturing facility in Eloy, Arizona (the "Property"). Although owned by Hessco, the Property was utilized by a wholly-owned subsidiary. Steve Hess was the controlling shareholder and president or CEO of Hessco, and the subsidiary.

In the late 1980's Hessco began experiencing financial difficulties. In mid–1989 it arranged for a loan of $1,002,000 to be secured by the Property, but the lender ultimately refused to fund, and in November Hessco ceased all manufacturing and put the Property on the market. Hessco had employed nearly 200 people at the Property; after manufacturing ceased, only four or five remained for service and warehousing tasks. Neither Hessco nor its subsidiary again used the Property for manufacturing.

In April 1991 Hessco entered into a sale and leaseback with the Imhof Family Trust ("Trust"). Appellee Hans Imhof and his wife (jointly, "Imhofs") are its trustees and income beneficiaries. The trust instrument requires the Imhofs as trustees to pay all trust income plus 9% of the net fair market value of the Trust's assets annually to themselves as income beneficiaries.

As a condition of its purchase of the Property, the Trust required Hessco to lease the Property back from the Trust under a seven-year triple net lease, at an initial rent of $9000 per month. Hess personally guaranteed the lease. Hans Imhof executed the lease in his individual capacity; the Trust was not named as a party. Shortly after the transaction, Imhof was elected to Hessco's board of directors. From the time it entered into the lease until it filed its bankruptcy petition, Hessco paid a total of $384,439.30 to the Trust in accordance with its obligations under the lease.[2]

Hessco filed a chapter 11[3] petition in 1993. The case was converted to chapter 7 in 1995, and Weneta Kosmala was appointed trustee. She filed a timely complaint against Imhof individually and as trustee of the Trust, and against Hess, seeking to avoid payments made under the lease as preferential transfers under § 547, fraudulent transfers under §§ 544 (and Cal. Civ.Code § 3439) and 548, and unauthorized post-petition transfers under § 549, and recovery of those payments under § 550. The trustee dropped the § 549 claim in her amended complaint.

After 16 days of trial from February to June 2001, the bankruptcy court found

---

1. More or less, and with minor elaborations respecting the issues at hand.

2. Although some payments were made to Hans Imhof individually, the bankruptcy court found that all funds were deposited into the Trust's bank account. Memorandum Decision, at 3.

3. Absent contrary indication, all section and chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330. All "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "FRCP" references are to the Federal Rules of Civil Procedure. "FRAP" references are to the Federal Rules of Appellate Procedure.

that the ordinary course of business defense applied, and entered judgment on 6 November for appellees on all causes of action. The court set forth its reasoning in a written memorandum, finding that Imhofs, as well as the Trust, were persons for whose benefit the transfers were made, so that if there were liability, they would be personally liable. Memorandum Decision, at 6 and 9. The trustee timely appealed. There was no cross-appeal; Hess did not appear in this appeal.

We found that the bankruptcy court erred in concluding that the ordinary course of business defense shielded defendants from liability, as they had presented no evidence of industry standards. At the same time, we held that the bankruptcy court had correctly determined that Imhof would be personally liable for any avoided transfers. We affirmed the judgment on the fraudulent transfer cause of action, affirmed the sanctions order, and remanded for entry of an appropriate judgment in favor of the trustee.

## II. ISSUES

Appellees timely requested rehearing under Rule 8015, arguing that we overlooked substantial evidence in the record in reversing the bankruptcy court's finding that the payments were made under ordinary business terms, and that we erred as a matter of law in concluding that the payments were made for the benefit of Imhof individually.

## III. STANDARDS

■ Rule 8015 does not set forth standards for granting rehearing, but as that rule was derived from FRAP 40, it is appropriate to look there for guidance. *Olson v. United States,* 162 B.R. 831, 834 (D.Neb.1993). Under FRAP 40, a party seeking rehearing must "state with particularity each point of law or fact that the petitioner believes the court has overlooked or misapprehended and must argue in support of the petition."

■ Petitions for rehearing are designed to ensure that the appellate court properly considered all relevant information in rendering its decision. *Armster v. U.S. District Court, C.D. Cal.,* 806 F.2d 1347, 1356 (9th Cir.1986). A petition for rehearing is not a means by which to reargue a party's case. *Anderson v. Knox,* 300 F.2d 296, 297 (9th Cir.1962).

## IV. DISCUSSION

### A. *Preference*

#### 1. *Ordinary Business Terms*

■ We reversed the bankruptcy court's conclusion that the ordinary course of business defense precluded judgment for the Trustee on the preference cause of action because appellees had failed to present evidence of prevailing business standards as required under *Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 732 (9th Cir.1994).

Appellees argue that the fair market value analysis of the subject property that was admitted into evidence below contains a "cornucopia" of circumstantial evidence from which prevailing business standards could be inferred, including vacancy factor, capitalization rate, rent and vacancy surveys, etc. According to appellees, these factors can be used to find the point at which it is economically preferable to replace a slow paying tenant. Additionally, appellees point out that the standard form lease provisions governing default are extremely liberal. Finally, appellees point to "extensive testimony" at trial regarding adverse economic conditions in the area during the relevant time. Appellees urge us to infer from this information that ordinary business terms "dictate[d] a certain

degree of liberality in accepting late payments."

During the pendency of this motion, the Ninth Circuit decided *Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.),* 315 F.3d 1192 (9th Cir.2003), *amended by* 326 F.3d 1028 (9th Cir.2003). The court explained the standard for proving the ordinary course defense:

> [C]reditors are not required to prove a particular uniform set of business terms, rather "ordinary business terms" refers to the *broad range* of terms that encompasses the practices employed by those debtors and creditors, including terms that are ordinary for those under financial distress. Only a transaction that is so unusual or uncommon "as to render it an aberration in the relevant industry," falls outside the broad range of terms encompassed by the meaning of "ordinary business terms."

315 F.3d at 1198. (citations omitted; emphasis in original). The decision does not affect our conclusion, as here there was simply no evidence of terms to which similarly situated parties adhere.

We did not overlook or misapprehend the evidence in our prior memorandum: nowhere in the proceedings before the bankruptcy court or before us have appellees even proposed any particular timing inference to be drawn from the fair market value analysis. Establishing one would presumably require expert testimony, and none was offered at trial.

Despite *Jan Weilert's* considerable relaxation of the burden on preference defendants in proving their affirmative defenses under § 547(c)(2)(C), it did not relieve them of the requirement to proffer *some* evidence to sustain that burden.

## 2. *Personal Liability*

### a. *Consideration of the issue:*

■ As noted above, appellee raised Imhof's personal liability as an issue in his brief. In her reply brief, appellant objected to our considering Imhofs' individual liability for any avoided transfers, as there had been no been timely cross-appeal. We addressed it anyway, citing *Mendocino Environmental Center v. Mendocino County,* 192 F.3d 1283, 1297–98 (9th Cir. 1999) (failure to file notice of cross-appeal is not a jurisdictional bar; an appellate court has authority to adjudicate the entire appeal before it and may waive the requirement of a notice of cross-appeal).

■ In responding to the motion for rehearing, appellant again suggests that we not revisit this issue, suggesting we had no jurisdiction to consider it in the first place, citing *Honolulu Weekly, Inc. v. Harris,* 298 F.3d 1037, 1041 (9th Cir.2002) and *S.M. v. J.K.,* 262 F.3d 914, 922–23 (9th Cir.2001). These cases state the general rule that an appellate court has discretion to dismiss an untimely cross-appeal. Neither holds that a notice of cross-appeal is jurisdictional or overrules *Mendocino Environmental Center's* holding that "an appellate court has broad power to make such dispositions as justice requires." 192 F.3d at 1298.

■ Factors to be considered in deciding whether to consider an issue that has not been raised in a timely cross-appeal include

> the interrelatedness of the issues on appeal and cross-appeal (particularly whether they involve the same parties), whether a notice of cross-appeal was merely late or not filed at all, whether the nature of the [trial] court opinion should have put the appellee on notice of the need to file a cross-appeal, [and] the

extent of any prejudice to appellant caused by the absence of notice .... *Mendocino Envtl. Ctr.*, 192 F.3d at 1299 (citations omitted).

The bankruptcy court's memorandum decision made clear that both Imhofs and the Trust would be liable for the avoided transfers had the ordinary course defense not applied. Appellees did not file a notice of cross-appeal, nor could they, as no judgment was entered against them. Nevertheless, they raised the issue in their brief, and it is intertwined with the other issues on appeal: one of the major points of contention was whether the debtor had an enforceable obligation to the Trust, or whether its obligation was to Imhof individually. In addition, the issue of who is liable for the avoided transfers is embedded in the larger issue of whether there is liability at all.

### b. *Substance:*

■ Appellees argue that, in upholding the bankruptcy court's finding that payments to the Trust were made for Imhof's benefit so as to render him individually liable for the avoided transfers, we overlooked *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544 (9th Cir.1991).

In *Bullion Reserve*, Saxon, the debtor's president, caused debtor to transfer $1.5 million to his personal account; he then loaned the funds to Kopelson and Miller. The funds were placed in Kopelson's bank account and used to purchase stock in Kopelson's and Miller's names. After the debtor filed a chapter 7 petition, the trustee obtained a stipulation that the initial transfer to Saxon was fraudulent. The trustee then sought to recover the $1.5 million from Miller. The bankruptcy court awarded judgment to the trustee, and the district court affirmed. The Ninth Circuit Court of Appeals reversed on the ground that an "entity for whose benefit such transfer was made" refers to one who receives a benefit as a result of the initial transfer, not a subsequent one, stating "[a] subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer." *Bullion Reserve*, 922 F.2d at 547–548 (citations omitted).

Appellees argue that *Bullion Reserve* compels the conclusion that Imhof is not individually liable. They contend that because Imhofs are not the residual beneficiaries of the Trust, and because the Trust is irrevocable, the only way they could benefit is by way of a subsequent transfer from the Trust. They further assert that it does not matter that Imhofs are the income beneficiaries, as there is no evidence of any transfers to them. We disagree. *Bullion Reserve* does not involve transfers into a trust, and does not compel the result appellees seek.

In our memorandum, we relied on *Kupetz v. United States (In re California Trade Technical Schools, Inc.)*, 923 F.2d 641 (9th Cir.1991), decided by another panel of the Ninth Circuit and filed less than a week after *Bullion Reserve*.[4] The debtor school held Title IV student assistance funds in trust for student beneficiaries, with the U.S. Department of Education ("DOE") retaining a claim to any funds not obligated to specific students. Debtor wrongfully diverted some of the Title IV funds, but eventually repaid them into the trust account. The Ninth Circuit conclud-

---

4. Appellees assert, without explication, that *California Trade Technical Schools* does not apply here because the case involved "reconstituted restitutional deposits." That is correct but irrelevant—the issue there was the nature of the funds transferred. They have not articulated how that distinction advances the proposition they here assert.

ed that the repaid funds were trust funds, and that the deposit made within the preference period was avoidable and recoverable from DOE as the entity for whose benefit the transfer was made. 923 F.2d at 648. Although the opinion did not squarely address the issue, it is clear that DOE's status as beneficiary of the trust was what rendered it the entity for whose benefit the transfer was made, which is consistent with the concept that beneficiaries are equitable owners of trust property.

Appellees misread both the statute and *Bullion Reserve:* there is not simply a dichotomy between initial and subsequent transferees. Rather, it is between initial transferees *and* those for whose benefit the transfer was made on one hand, and subsequent transferees on the other. Here the bankruptcy court found as a matter of fact that Imhofs were persons for whose benefit the transfers were made. Appellees have not challenged that finding. As the Ninth Circuit recognized in *Bullion Reserve,* such parties are liable, *whether or not* they actually benefit from the transfers in question. 922 F.2d at 547. The language on which appellees rely, that a subsequent transferee cannot be one for whose benefit the transfer was made, is simply an explication of § 550(a): if the transfer is for one's benefit, one is classed with initial transferees, and not as a subsequent transferee.

Here, the Trust is a charitable remainder unitrust (CRUT):

a legal device pursuant to which a taxpayer can transfer assets to a trust, ... take an immediate charitable tax deduction on his personal income taxes, insure himself a guaranteed stream of income generated by the trust assets (on which he must pay income taxes), defer the taxes on the transactions by and accumulations in the trust, control the manner in which trust assets are invested, and control who gets the remainder interest in the trust assets when the taxpayer and named future income beneficiaries die. The only hitch is that at some point down the line, when the settlor and all individuals whom he has named to follow him as income beneficiaries leave this earth, what's left in the trust must go to a qualified charitable organization. To make sure that this happens, in order to qualify for favorable tax treatment, a CRUT must be irrevocable and is subject to rigid rules of operation. It goes without saying that a CRUT is a tax planning tool for the rich.

*Lindquist v. Mack (In re Mack),* 269 B.R. 392, 394 (Bankr.D.Minn.2001).

Imhofs are the trustors and trustees of the Trust. They are also the income beneficiaries; the residual beneficiary is a foundation. As indicated above, the trust instrument requires them as trustees to pay all Trust income plus 9% of the net fair market value of its assets to themselves as income beneficiaries annually.

Although Imhofs are not the sole beneficiaries, the bankruptcy court did not err in finding the deposits to the Trust's account were made for their benefit.

## IV.  CONCLUSION

In sum, appellees have not demonstrated that we overlooked or misapprehended any point of law or fact. Accordingly, their motion for rehearing is DENIED.