FILED

APR 10 2017

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**
**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No.   CC-16-1272-LKuF |
| | ) | |
| EVERGREEN OIL, INC., | ) | Bk. No.   8:13-bk-13163-SC |
| | ) | |
| Debtor. | ) | Adv. No.  8:15-ap-01163-SC |
| _____ | ) | |
| MONTEREY MECHANICAL CO., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[*] |
| | ) | |
| OVERSIGHT COMMITTEE, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Argued and Submitted on March 23, 2017
at Pasadena, California

Filed - April 10, 2017

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Scott C. Clarkson, Bankruptcy Judge, Presiding

_____

Appearances:   Donald W. Reid argued for Appellant Monterey Mechanical Co.; Russell H. Rapoport argued for Appellee Oversight Committee.

_____

Before:  LAFFERTY, KURTZ, and FARIS, Bankruptcy Judges.

---

[*]   This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

On April 2, 2013, seven days before filing its chapter 11[1] case, Evergreen Oil, Inc. ("Evergreen") wire transferred $120,390.44 to Monterey Mechanical Co. ("Monterey") in payment of an invoice for millwright services dated December 18, 2012 (the "Transfer"). Evergreen's confirmed chapter 11 plan of reorganization appointed an Oversight Committee to recover preferential and fraudulent transfers; the Oversight Committee sued Monterey to avoid the Transfer as preferential under § 547(b) and to recover the Transfer for the benefit of the estate under § 550.

Monterey did not dispute that the elements of a preferential transfer had been met but asserted the affirmative defense under § 547(c) that the Transfer was made in the ordinary course of business. After trial, the bankruptcy court found that Monterey had not met its burden to show that the Transfer was either made in the ordinary course of business or financial affairs of the debtor and transferee or made according to ordinary business terms. Therefore, the bankruptcy court entered judgment in favor of the Oversight Committee. Monterey timely appealed. We AFFIRM.

**FACTS**[2]

Monterey is an industrial contractor and metal fabricator. Monterey also has a millwright division, which provides machine

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[2] In this factual recitation, we borrow heavily from the bankruptcy court's memorandum decision.

-2-

maintenance services to local industrial businesses, including Evergreen, a waste oil refinery located in Newark, California.

Monterey first provided millwright services to Evergreen in January 2010, and the two companies did business at least 11 times prior to December 2012. From November 30, 2012 to December 12, 2012, Monterey provided maintenance services for Evergreen. On December 18, 2012, Monterey sent an invoice in the amount of $120,390.44 to Evergreen for these services (the "Invoice"). The Invoice, like all of Monterey's invoices, stated that the terms were "net-30," meaning that payment is due 30 days after the date of the invoice.

On February 5, 2013, 49 days after the Invoice date, Monterey's Chief Financial Officer, Paul Moreira, sent an e-mail to Evergreen's Chief Financial Officer, William Scottini, inquiring about the status of the payment. Over the course of the next two months, the parties exchanged emails and phone calls. In the course of those communications, Scottini explained to Moreira that Evergreen was having cash flow issues but assured Moreira that he intended to get the invoice paid.

On April 2, 2013, 105 days after the date of the Invoice, Evergreen transferred $120,390.44 to Monterey by way of a wire transfer. One week later, on April 9, 2013, Evergreen filed a chapter 11 bankruptcy petition. It was undisputed that for the 90 days prior to filing bankruptcy, Evergreen was insolvent.

On September 13, 2013, Evergreen's Third Amended Plan of Reorganization was confirmed. Pursuant to the confirmed plan, the Oversight Committee was appointed to pursue causes of action under Chapter 5 of the Bankruptcy Code. On April 6, 2015, the

Oversight Committee filed an adversary proceeding seeking avoidance of the Transfer as preferential under § 547 and recovery under § 550 and disallowance of any claim asserted by Monterey in Evergreen's bankruptcy case. Monterey asserted two affirmative defenses: (1) that the transfer was made in the "ordinary course of business" pursuant to § 547(c)(2)(A), and (2) that the transfer was made according to "ordinary business terms" pursuant to § 547(c)(2)(B). At trial, Monterey's counsel conceded that all the elements of § 547(b) were met; thus, the ordinary course defense was the only issue litigated at trial. Direct testimony was by declaration; the witnesses were Scottini, Moreira, Jim Troup (President of Monterey), and Joe Petrovich (Manager of Monterey). The trial declarations of Troup, Petrovich, and Moreira were substantively identical. Although Petrovich and Moreira were available at trial, only Scottini and Troup were cross-examined.

After trial, the bankruptcy court issued written findings and conclusions, ruling that Monterey had not met its burden to prove either defense, and entered judgment in favor of the Oversight Committee in the amount of $120,390.44. Monterey timely appealed.

### JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(F). We have jurisdiction under 28 U.S.C. § 158.

### ISSUES

Did the bankruptcy court err in finding that Monterey failed to meet its burden to show that the Transfer was made in the

-4-

ordinary course of business?

Did the bankruptcy court err in finding that Monterey failed to meet its burden to show that the Transfer was made according to ordinary business terms?

**STANDARDS OF REVIEW**

Whether the bankruptcy court applied the correct legal standard is a question of law that we review de novo. See Bell Flavors & Fragrances, Inc. v. Andrew (In re Loretto Winery, Ltd.), 107 B.R. 707, 709 (9th Cir. BAP 1989). Whether a payment is made according to ordinary business terms is a question of fact reviewed for clear error. Arrow Elecs., Inc. v. Justus (In re Kaypro), 230 B.R. 400, 403 (9th Cir. BAP 1999), aff'd in part, rev'd in part, 218 F.3d 1070 (9th Cir. 2000). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). Regardless of whether we would have weighed the evidence differently, if the trial court's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).

**DISCUSSION**

The Bankruptcy Code authorizes a trustee to avoid:

any transfer of an interest of the debtor in property--

> (1) to or for the benefit of a creditor;

> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

                    (3) made while the debtor was insolvent;

                    (4) made--

                          (A) on or within 90 days before the date
                    of the filing of the petition; or

                          (B) between ninety days and one year
                    before the date of the filing of the
                    petition, if such creditor at the time of
                    such transfer was an insider; and

                    (5) that enables such creditor to receive
                    more than such creditor would receive if--

                          (A) the case were a case under chapter 7
                    of this title;

                          (B) the transfer had not been made; and

                          (C) such creditor received payment of
                    such debt to the extent provided by the
                    provisions of this title.

§ 547(b).

     However, the trustee may not avoid such a transfer:

     to the extent that such transfer was in payment of a
     debt incurred by the debtor in the ordinary course of
     business or financial affairs of the debtor and the
     transferee, and such transfer was--

           (A) made in the ordinary course of business
           or financial affairs of the debtor and the
           transferee; or

           (B) made according to ordinary business
           terms[.]

§ 547(c)(2).

     To establish this "ordinary course" defense, the creditor

has the burden to demonstrate (1) that the transfer was in

payment of a debt incurred by the debtor in the ordinary course

of business or financial affairs of the debtor and the

transferee; **and** (2) that it was (a) made in the ordinary course

of business or financial affairs of the debtor and the

transferee; **or** (b) made according to ordinary business terms.

-6-

See Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.), 315 F.3d 1192, 1197 (9th Cir. 2003), amended by In re Jan Weilert RV, Inc., 326 F.3d 1028 (9th Cir. 2003).

The ordinary course defense is intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee." Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.), 832 F.2d 997, 1004 (7th Cir. 1987). The purpose of the defense is "to leave undisturbed normal financial relations because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com), 504 F.3d 775, 789 (9th Cir. 2007) (citations omitted).

The bankruptcy court found that Monterey had established that the debt was incurred in the ordinary course of business between Evergreen and Monterey: the Invoice was for annual maintenance for Evergreen, and the evidence at trial established that this was normal; the parties also stipulated that the amount of the Transfer was the reasonable value of Monterey's work.

However, the bankruptcy court found that Monterey had not met its burden to show that either the Transfer was in the ordinary course of business between Monterey and Evergreen or that the Transfer was made according to ordinary business terms. Monterey challenges both of these findings.

///

///

-7-

**A.    The bankruptcy court did not err in finding that the Transfer was not in the ordinary course of business between Monterey and Evergreen.**

To establish that a payment was made in the ordinary course of business between the transferor and transferee, the creditor must demonstrate that the alleged preferential transfer was ordinary in relation to past practices between the parties. Id. at 790. The creditor must show (1) the baseline of past practices between itself and the debtor; and (2) that the relevant payments were ordinary in relation to those past practices. Id.

In determining whether a payment is ordinary in relation to past practices, courts consider (1) the length of time the parties were engaged in the transactions at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition. Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.), 482 F.3d 1118, 1129 (9th Cir. 2007) (citing Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.), 25 F.3d 728, 732 (9th Cir. 1994)).

The bankruptcy court found that although Monterey demonstrated that it did not engage in unusual collection activities or take advantage of Evergreen's deteriorating financial condition, the timing, amount, and form of tender of the Transfer was "a significant divergence from Monterey and Evergreen's established baseline of past practices."

At trial, Monterey presented a summary of invoicing and

-8-

payment history between the parties. The summary listed Monterey's invoices and Evergreen's payments for invoices dated between January 4, 2010 through December 18, 2012, including the Invoice.[3] Although the term of each invoice was "net 30," all but one payment was made more than 30 days after the invoice date. The earliest payment Evergreen made to Monterey during the relevant period was 19 days after the December 22, 2010 invoice, while the latest payment was made 232 days after the March 16, 2010 invoice. The bankruptcy court found that for the "entire history" between Monterey and Evergreen, each payment, not including the payment for the Invoice, was late by a weighted average of 61 days, or 91 days after the invoice.

Single invoice amounts ranged from $2,307.00 to $156,234.90. But because two of the invoices (including the $156,234.90 invoice) were paid in installments, the Transfer ($120,390.44) was the largest single payment amount: the payments on the other invoices ranged between $2,307.00 and $55,607.51. The $156,234.90 invoice, the closest in amount to the Invoice, was paid in seven installments: five installments of $25,000, one installment of $15,207.50, and one installment of $16,027.40. Those installments began 37 days after the invoice date, and the final installment was paid 75 days after the invoice date. The $25,007.44 invoice was paid in three installments of $12,000 (202 days after the invoice date), $6,500.00 (216 days after the

---

[3] For reasons that were not explained, the summary splits the Invoice into two amounts, $120,262.00 and $128.44; for ease of reference, we continue to refer to the Invoice in the singular.

-9-

invoice date), and $6,507.44 (232 days after the invoice date). The rest of the invoices were paid in lump sums.

The bankruptcy court acknowledged that late payments do not necessarily establish that a transaction falls outside the ordinary course, where "the prior course of conduct between the parties demonstrates that those types of payments were ordinarily made late." In re Grand Chevrolet, 25 F.3d at 732 (citations omitted). The bankruptcy court calculated that the Transfer, which was made 105 days after the invoice date, was made about two weeks later than the average period of 90.42 days after the invoice date, but that the Transfer fell within the previously established range of payments. However, the bankruptcy court concluded that "no clear pattern of payments" was apparent from the summary.[4]

The bankruptcy court placed great weight on the fact that the Transfer was much larger than any previous payment made by Evergreen to Monterey and that the payment was made by wire transfer rather than by check, which was the payment method used

[4] The court seemed troubled by the fact that there was a 23-month gap when Monterey and Evergreen did no business, noting that in the pre-preference period the longest time between invoices was eight months. The bankruptcy court thus concluded that the "the timing factor alone might render the Transfer outside the ordinary course of business." Scottini testified that Evergreen's Newark facility had suffered fire damage in March 2011 but that the damage was repaired as of September 29, 2012, after which Evergreen continued to operate in the ordinary course through confirmation of its plan of reorganization. This testimony suggests that Evergreen did not complete its annual maintenance at the end of 2011 due to the fire. However, this factor was not the primary basis for the court's ruling; instead, the court found that the amount and form of tender of payment took the Transfer outside of the ordinary course.

-10-

by Evergreen in all past transactions between the parties. The largest payment prior to the Transfer was $55,607.51; the Transfer ($120,390.44) was more than twice that amount.

Regarding form of tender, the bankruptcy court acknowledged that the wire transfer was not a per se indication that the payment was made out of the ordinary course of business, but noted that Monterey had not provided "any evidence to show that either it routinely accepted wire transfers in this circumstance, or that Evergreen routinely paid its invoices in the form of wire transfers." On cross-examination, Scottini testified that he decided to pay the Invoice by wire because "I was getting [undue] pressure, because Evergreen and the cash flow situation the company was under, to make a wire, because I was getting phone calls and/or e-mails regarding payment."

Monterey argues that the bankruptcy court applied an incorrect legal standard by focusing solely on the necessary showing for a baseline of past practices and concluding that there was no clear pattern of payments. Monterey contends that the Ninth Circuit does not require such a restrictive showing for a baseline of past practices. Monterey also contends that, while the amount of the Transfer was greater than any prior single payment and that the form of the Transfer differed from past practices, these facts alone do not defeat the ordinary course of business defense because no one factor is conclusive, citing In re Healthcentral.com, 504 F.3d at 791.

The bankruptcy court applied the correct legal standard. The bankruptcy court's finding that there was no clear pattern of payments was not dispositive. Further, although Monterey is

-11-

correct that no one factor is necessarily conclusive, the Ninth Circuit has instructed that "all evidence shedding light on the practices between the parties, past and present, should be considered." Id. The bankruptcy court considered the evidence and weighed that evidence as it deemed appropriate. The bankruptcy court's account of the evidence is plausible; thus, regardless of whether we would have weighed the evidence differently, we cannot reverse the court's findings. Anderson, 470 U.S. at 573. Viewing all of the evidence submitted by Monterey in support of its defense, we cannot conclude that the bankruptcy court applied an incorrect legal standard or clearly erred in finding that the Transfer was not made in the ordinary course of dealings between these parties. The amount and method of the Transfer stands out as an aberration from the past dealings of the parties; thus there is evidence to support the bankruptcy court's findings.

**B.  The bankruptcy court did not err in finding that Monterey failed to establish that the Transfer was made according to ordinary business terms.**

As an alternative to establishing that a transaction falls within the ordinary course of dealings between the parties, a creditor may show that the parties' dealings were "ordinary in relation to prevailing business terms." In re Healthcentral.com, 507 F.3d at 791. The standard is an objective one: the defendant must first "establish the 'broad range' of business terms employed by similarly situated debtors and creditors, including those in financial distress, during the relevant period." Id. (citing In re Jan Weilert RV, Inc., 315 F.3d at 1197). Second,

the creditor must show that the transfer was ordinary in relation to the established prevailing business terms. Id. "Only a transaction that is so unusual or uncommon as to render it an aberration in the relevant industry falls outside the broad range of terms encompassed by the meaning of 'ordinary business terms.'" In re Jan Weilert RV, Inc., 315 F.3d at 1198 (citation omitted).

Troup testified that, based on his 25 years in the construction industry, most companies in Monterey's industry receive payment well after the typical net-30 contract term. Troup explained that this is because (1) Monterey's millwright customers are typically large corporations with bureaucratic purchasing departments that need multiple approvals to get invoices paid and/or use their leverage to stretch payment terms to 90-120 days; and (2) engineering firms usually acquiesce to longer payment terms to encourage repeat business and because payment is usually assured because the manufacturers tend to be financially stable, the engineering firms can exercise mechanic's lien rights if they are not paid, and the engineering firms recognize that the manufacturer cannot operate without working machinery. The Petrovich and Moreira declarations contained the same recitations, which were based on the declarants' "extensive experience in the industry" and "personal interactions with Monterey's customers and competitors."

Troup (and Petrovich and Moreira) also provided a summary of invoicing and payment history for some of Monterey's other customers--C&H Sugar, Coca Cola, Foster's Group, and Pacific Steel Casting--to show that the payment history for Evergreen was

consistent with the payment history of those other customers. That table showed payments made ranging from a low of 82 days after invoicing to a high of 168 days after invoicing (both by Coca Cola). As noted above, the Transfer was made 105 days after the invoice date. Troup also noted that it was customary for Monterey's customers to make lump sum payments for the invoiced amounts and that it frequently received payments exceeding $100,000.

The bankruptcy court found that the declarations were insufficient to establish prevailing business terms. The court concluded that Monterey's evidence "failed to provide a complete picture of what ordinary business practices are for the industry." We agree. Other than the conclusory statements contained in the trial declarations that late payments were the norm in the industry, no specific evidence was presented as to the practices of other companies providing millwright services. And no evidence was introduced to show that the customers listed in Monterey's summaries were similarly situated to Evergreen. According to the declaration testimony, C&H Sugar, Coca Cola, and Foster's Group were financially stable, and Pacific Steel Casting was financially distressed. However, the evidence showed that Pacific Steel Casting never made a late, large lump-sum payment comparable to the Transfer: according to the summary, during 2011 and 2012, Pacific Steel Casting made five payments ranging from $2,320.50 to $14,651.33, and payments were made anywhere from 88 to 101 days after the invoice date.

The bankruptcy court thus concluded that Monterey had failed to establish what is ordinary in the millwright industry or that

-14-

a lump-sum transfer in excess of $100,000 is ordinarily paid at or around 105 days after invoicing by any company, let alone a financially distressed company such as Evergreen.  The evidence supports this conclusion; we find no clear error in the bankruptcy court's finding.

## CONCLUSION

For these reasons, the bankruptcy court did not err in finding that Monterey failed to meet its burden to prove the ordinary course of business defense.  Accordingly, we AFFIRM.