**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

In re: HEALTHCENTRAL.COM, a
Delaware Corporation,

*Debtor,*

SIGMA MICRO CORPORATION,

*Appellant,*

v.

HEALTHCENTRAL.COM,

*Appellee.*

No. 04-17565

BAP No.
NC-04-01010-BSP

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Perris, Smith, and Brandt, Bankruptcy Judges, Presiding

Argued and Submitted
October 19, 2006—San Francisco, California

Filed September 21, 2007

Before: Melvin Brunetti, Diarmuid F. O'Scannlain, and
Stephen S. Trott, Circuit Judges.

Opinion by Judge Brunetti

12823

## COUNSEL

Iain Macdonald, Macdonald & Associates, San Francisco, California, for the appellant.

Tobias Keller, Pachulski, Stang, Ziehl, Young, Jones & Weintraub PC, San Francisco, California, for the appellee.

## OPINION

BRUNETTI, Circuit Judge:

## INTRODUCTION

Sigma Micro Corporation ("Sigma") appeals from a grant of summary judgment in favor of the responsible individual for a group of consolidated debtors avoiding several payments made to Sigma. Sigma asserts that: (1) the bankruptcy court who issued the summary judgment lacked the jurisdiction to do so and (2) even if jurisdiction was proper, summary judgment should not have been granted. We affirm in part, reverse in part, and remand.

## BACKGROUND

On January 23, 1998, Sigma entered into a binding license agreement ("the Agreement") with L&H Vitamins, Inc. ("L&H"). The basic terms of the Agreement called for Sigma to provide L&H with critical hardware and software, as well as routine maintenance and support services. In turn, the Agreement obligated L&H to pay Sigma a one-time set fee for the hardware and software, as well as ongoing fees for its maintenance and support services. Sigma was to bill L&H by invoice and L&H was to pay Sigma as soon as the relevant invoice was received, otherwise an interest charge would apply.

In addition to these basic terms, Sigma and L&H also agreed all rights and obligations under the Agreement would be binding not only on L&H, but also on each of its "affiliates." At the time of the Agreement, L&H was part of a vast network of companies who together provided "online healthcare-related e-commerce and content to consumers" ("the Network"). The Network was managed by the Healthcentral.com ("Healthcentral"), and further included Vitamins.com, Inc., Vitamins.com LLC, J&M Direct Corporation,

HealthCentralRX.com, Inc., WebRx.com, HCEN Acquisition Corp., HealthCentral Enterprise Web Services, Inc. and HealthCentral.ca.

Once their agreement was in place, Sigma and L&H maintained an "ordinary" relationship for the next several years. Sigma would send L&H invoices for its maintenance and support services. And Healthcentral would send Sigma a payment on L&H's behalf, anywhere from 16 to 105 days after the invoice was received. According to the evidence, this pattern was completely "ordinary" for the "industry" at the time.

Starting in 2000 however, L&H, as well as the other Network companies, started to experience financial problems. In particular, problems arose over the Network's available cashflow and ability to secure additional funding. As such, by 2001, Healthcentral instituted an "old school" cash-flow management system, whereby core staff would meet in person on a weekly basis to discuss which creditors were to be paid. The meetings were attended by Healthcentral's Controller, or Assistant Controller, accounts payable team, Vice President of Finance, and Vice President of Merchandising. From these meetings a list of preferred creditors was produced and given to Healthcentral's President, who ultimately decided which creditors to pay.

One of the creditors who continued to be paid during this period was Sigma. Healthcentral's core staff determined Sigma's maintenance and support services were critical to keeping L&H's software running, and L&H's software was essential to its business. Accordingly, despite a serious period of financial difficulty, Healthcentral still made three payments to Sigma, including: (1) an August 8, 2001, payment in the amount of $7,484.50 for invoices dated May 15, 2001; (2) an August 16, 2001, payment in the amount of $4,608.03 for invoices dated May 31 and June 15, 2001; and (3) a September 16, 2001 payment in the amount of $11,003.00 for

invoices dated July 15, July 31, August 15, and August 31, 2001.

Less than a month after the last payment, however, L&H, as well each of the other Network companies, filed voluntary petitions for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Northern District of California. The Network companies submitted a proposed plan for reorganization and liquidation, which was ultimately approved by the court on June 27, 2002. Pursuant to the plan, L&H was substantively consolidated with all other Network companies into a single liquidating debtor ("the debtor"), and all the debtor's available funds were then transferred into a single claims account. John Barnard ("Barnard") was appointed responsible individual for the debtor and instructed to pursue any and all actions on behalf of the debtor.

## PROCEEDINGS BELOW

On February 12, 2003, Barnard brought an action to avoid and recover certain payments made to Sigma as preferences under 11 U.S.C. § 547(b)[1]. Barnard brought his action in the U.S. Bankruptcy Court for the Northern District of California, as all civil actions arising under Title 11 were automatically referred there by the district court. Local Fed. R. Bankr. P. 5011-1(a);[2] *see* 28 U.S.C. § 157(b)(1) (stating bankruptcy courts posses jurisdiction over all cases arising under Title 11 which were "referred" by the district court). In his action Barnard sought to avoid and recover the August 8th, August 16th, and September 16th payments, claiming each was "preferentially" made to Sigma during a period of severe financial distress. § 547(b). The total amount of these payments, Barnard

---

[1]Unless stated otherwise, all statutory references hereinafter are to Title 11 of the United States Code.

[2]Unless stated otherwise, all "Local Rule" references hereinafter are to the Local Bankruptcy Rules for the Northern District of California, *at* http://www.canb.uscourts.gov/.

alleged, was $23,095.53. The action against Sigma was only one of approximately 30 preference actions brought by Barnard under § 547(b) against various creditors.

In response to the action, Sigma filed an answer and demand for a jury trial. Sigma answered that none of the debtor's payments constituted preferences under § 547(b), and furthermore, the payments were made in the "ordinary course of business" and thus not recoverable under § 547(c)(2). As to the jury trial, Sigma stated it would not consent to a trial in the bankruptcy court, and therefore jurisdiction was no longer proper there. Instead, Sigma demanded the action be transferred to the district court for further proceedings.

Thereafter, on August 10, 2003, Sigma filed a Motion for Certification to the District Court. In this motion Sigma argued once more the bankruptcy court was not permitted to maintain jurisdiction over the action and it needed to be "certified" to the district court. Sigma's rationale was twofold.

First, Sigma pointed to Local Rule 9015-2(b), which states:

> If the Bankruptcy Judge determines that [a] demand was timely made and the party has a right to a jury trial, and if all parties have not filed written consent to a jury trial before the Bankruptcy Judge, the Bankruptcy Judge shall certify to the District Court that the proceeding is to be tried by a jury and that the parties have not consented to a jury trial in the Bankruptcy Court. Upon such certification, [the jurisdictional] reference of the proceeding shall be automatically withdrawn, and the proceeding assigned to a Judge of the District . . . .

According to Sigma, all of the requirements of Local Rule 9015-2(b) had been satisfied, and thus the jurisdictional reference to the bankruptcy court, Local Rule 5011-1(a), had to be withdrawn and the action transferred to the district court.

Second, aside from Local Rule 9015-2(b), Sigma pointed to its valid right to a Seventh Amendment jury trial in the district court. According to Sigma, it had been "held" that once a valid jury trial right was found, the bankruptcy court could no longer maintain jurisdiction and the entire action needed to be instantly transferred to the district court. In support of its position Sigma cited *In re Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

Following Sigma's Motion for Certification the debtor filed an opposition arguing jurisdiction was proper in the bankruptcy court and that a transfer was not required. The debtor conceded jurisdiction was exclusively vested in the district court for *trial*, but that did not mean the bankruptcy court could not retain jurisdiction *pre-trial*. Instead, the debtor explained, foregoing jurisdiction and transferring the action to district court *pre-trial* was a matter of discretion to be guided by judicial economy. Under this standard, it was often the case, as it was here, that a bankruptcy court's familiarity with the present action, as well as related cases, presented real economic reasons to retain the action. Accordingly, Sigma's Motion for Certification could and should be denied.

On July 1, 2003, the bankruptcy court issued an order on the Motion for Certification to the District Court. The court's order struck a balance between the positions of Sigma and the debtor. On one hand, the court "certified" the action to district court, finding that Sigma had satisfied all of the requirements of Local Rule 9015-2(b). On the other hand, the court "stayed" the "effective date" of the "certification" so that the court could retain jurisdiction over all "pre-trial proceedings." Accordingly, the action stayed in the bankruptcy court.

With the proper court determined, the debtor turned to filing a Motion for Summary Judgment. The motion was based on two arguments.

First, the debtor asserted there was no genuine dispute that three preference payments had been made to Sigma under

§ 547(b). On August 8th, August 16th, and September 16th, the debtor issued payments from its own accounts to Sigma, a creditor, to account for previously rendered maintenance and support services. § 547(b)(1), (2). The payments were sent to Sigma within 90 days of the debtor filing for Chapter 11 bankruptcy, a period of severe financial distress. § 547(b)(3), (4)(A). And the payments, which paid 100 percent of the submitted invoices, allowed Sigma to recover more than it would have had the payments been made in a Chapter 7 liquidation. § 547(b)(5).

Second, the debtor asserted that Sigma had not shown it possessed an ordinary course of business defense under § 547(c)(2). In light of its cash-flow and funding problems the debtor instituted an unusual cash management system, whereby the debtor's core staff met weekly to determine which creditors would be paid. That Sigma was preferred over other creditors and paid as a result of this unusual cash-flow management system was anything but "ordinary" for the debtor or the debtor's industry. § 547(c)(2)(B), (C).

To support its motion the debtor offered three pieces of evidence, including: (1) duplicate copies of the August 8th, August 16th, and September 16th payments, as well as the relevant invoices; (2) a full and complete copy of the Agreement; and (3) a declaration by Rita Schilling ("Schilling"), Healthcentral's controller, who provided all of the background surrounding the August 8th, August 16th and September 16th payments.

A month later Sigma filed an opposition to the Motion for Summary Judgment. Sigma's opposition was also based on two arguments.

First, Sigma asserted the debtor had not met its "burden" of "showing" preference payments under § 547(b). According to Sigma, the Schilling declaration, which provided all of the facts used by the debtor to prove its § 547(b) action, was "rid-

dled with evidentiary problems" and thus could not be considered. Without this declaration the debtor had clearly not shown that the August 8th, August 16, and September 16th payments were preferences.

Second, Sigma asserted that it had shown that it possessed an ordinary course of business defense under § 547(c)(2). The debtor's payments accounted for past maintenance and support services provided by Sigma in the ordinary course of business. § 547(c)(2)(A). And the payments were made within an ordinary time frame, and in an ordinary manner, even if they came out of an "old-school" cash management system. § 547(c)(2)(B), (C).

To support its opposition, Sigma offered a single piece of evidence: a declaration by Theresa Backof ("Backof"), a credit executive certified by the National Association of Credit Management ("NACM") with 24 years of credit and payment experience. After reviewing all the evidence, including NACM data, Backof made findings, which included: (1) that in her "opinion [the] payment in the ordinary course of business between the debtor and Sigma, as established by their course of dealings over a three-year period, [was] a range of 16 to 105 days"; (2) that "[i]nformation obtained from NACM show[ed] that, on an industry-wide basis, payments of invoices, for the period June of 2001 through October of 2001, ranged from 23 to 100 days from the billing date. [And that t]his data reflect[ed] the payment history of all customers of all reporting companies[, t]hus [making] payment in the ordinary course of business in the industry . . . as a range of 23 to 100 days"; (3) that the August 8th, August 16th, and September 16th payments paid invoices anywhere from 16 to 90 days after the billing date; and (4) that the debtor's "[a]ccounts payable meetings [were] somewhat 'old school' as businesses now move forward with the use of software for cash management; [but that] the concept [was] the same."

On November 3, 2003, after considering all the evidence and holding a hearing, the court granted summary judgment

in favor of the debtor. First, the court held the debtor had shown through the Schilling declaration that the August 8th, August 16th, and September 16th payments constituted preferences under § 547(b). Furthermore, none of the evidentiary objections lodged against the Schilling declaration had any merit. Second, the court held Sigma had not shown through the Backof declaration that the August 8th, August 16th, or September 16th payments were made in the ordinary course of business under § 547(c)(2). The Backof declaration had not established that the debtor's "old school" cash-flow management system for paying creditors was ordinary for the parties or for the industry. As such, judgment was entered as a matter of law in favor of the debtor in the amount of $23,095.53.

From there Sigma filed a timely appeal, which was heard by the United States Bankruptcy Appellate Panel of the Ninth Circuit ("BAP"). Sigma's appeal raised two issues: (1) whether the bankruptcy court erred in retaining jurisdiction over the action in light of Local Rule 9015-2(b) and Sigma's valid right to a Seventh Amendment jury trial in the district court and (2) whether the bankruptcy court erred in granting summary judgment in favor of the debtor on its preference action under § 547(b) and Sigma's ordinary course of business defense under § 547(c)(2). The BAP affirmed.

Thereafter, on October 27, 2004, Sigma filed a timely notice of appeal to this court.

## STANDARD OF REVIEW

On appeal "[t]his court reviews decisions of the BAP *de novo*, and thus reviews the bankruptcy court's decision[ ] under the same standards used by the BAP." *Arrow Elecs., Inc. v. Justus* (*In re Kaypro*), 218 F.3d 1070, 1073 (9th Cir. 2000). We review the bankruptcy court's findings of fact for clear error. *Carillo v. Su* (*In re Su*), 290 F.3d 1140, 1142 (9th Cir. 2002). And we review the bankruptcy court's conclusions of law de novo. *Am. Law Ctr. PC v. Stanley* (*In re Jastrem*),

253 F.3d 438, 441 (9th Cir. 2001); *see also In re Vylene Enters.*, 90 F.3d 1472, 1475 (9th Cir. 1996) ("Because the issue here is whether the bankruptcy court had jurisdiction . . . we conduct a *de novo* review."); *Beeler v. Jewel* (*In re Stanton*), 303 F.3d 939, 941 (9th Cir. 2002) ("We review a bankruptcy court's decision to grant a motion for summary judgment de novo.") Finally, we review any evidentiary ruling by the bankruptcy court for an abuse of discretion. *Ardmor Vending Co. v. Kim* (*In re Kim*), 130 F.3d 863, 865 (9th Cir. 1997).

## DISCUSSION

## I. Jurisdiction

At the outset we address Sigma's argument concerning the bankruptcy court's jurisdiction. Sigma concedes jurisdiction was initially proper in the bankruptcy court, pursuant to § 157(b)(1) and Local Rule 5011-1(a), but claims the court was not permitted to retain jurisdiction over the action for pre-trial proceedings. To support its argument Sigma yet again points to (1) Local Rule 9015-2(b) and (2) its valid right to a Seventh Amendment jury trial. We address each below and hold the bankruptcy court did not err in retaining jurisdiction over the action for pre-trial proceedings.

## A. Local Rule 9015-2(b)

As noted above Sigma first finds support for its jurisdictional argument in Local Rule 9015-2(b). According to Sigma, under Local Rule 9015-2(b) if a party: (1) has a right to a jury trial in the district court, (2) makes a timely demand for jury trial in the district court, and (3) has not "consent[ed] to a jury trial" elsewhere, the bankruptcy court must "automatically" "withdraw[ ]" the district court's jurisdictional reference. *See Dunmore v. United States*, 358 F.3d 1107, 1116-17 (9th Cir. 2004).

**[1]** Under Sigma's construction of Local Rule 9015-2(b) we are confronted with an issue of first impression in this circuit, that is, the validity of Local Rule 9015-2(b).

**[2]** The rules associated with local bankruptcy rules are clear. As part of the Bankruptcy Code Congress delegated to the Supreme Court the power to make and enforce general bankruptcy rules. 28 U.S.C. § 2075. Pursuant to this authority, the Supreme Court promulgated Federal Rule of Bankruptcy Procedure 9029 ("Rule 9029"), which grants district courts the power to adopt their own local rules. *Brown v. Smith* (*In re Poole*), 222 F.3d 618, 621 (9th Cir. 2000). Under Rule 9029, however, this power is strictly limited. 10 Collier on Bankruptcy ¶ 9029.01[1], 9029-2 (rev. 15th ed. 2006.) Rule 9029 states a local bankruptcy rule must: (1) be consistent with the Acts of Congress and Federal Rules of Bankruptcy Procedure; (2) not be duplicative of the Acts of Congress or Federal Rules of Bankruptcy Procedure; and (3) not limit the use of Official Bankruptcy Forms. *Steinacher v. Rojas* (*In re Steinacher*), 283 B.R. 768, 772-73 (9th Cir. BAP 2002).[3] If any of these limits are not observed, the local bankruptcy rule must be held invalid.

**[3]** Considering these rules we hold Local Rule 9015-2(b) to be invalid as it establishes a procedure for withdrawing the district court's jurisdictional reference inconsistent with the Acts of Congress and Federal Rules of Bankruptcy Procedure. *Cf. Coffey v. Marina Management Servs.* (*In re Kool, Mann, Coffee*), 23 F.3d 66, 67-69 (3rd Cir. 1994) (finding local rule invalid because of inconsistency with Bankruptcy Code); *In re Morrissey*, 717 F.2d 100, 104-05 (3rd Cir. 1983) (same).

---

[3]We acknowledge decisions by the BAP are not binding on this court. *Oninck v. Cardelucci* (*In re Cardelucci*), 285 F.3d 1231, 1234 (9th Cir. 2002). That does not mean, however, BAP decisions may not be persuasive and aide us in our reading of the Bankruptcy Code. *Id.* ("While this Court is not bound by a B.A.P. decision, we find the reasoning of [the B.A.P.] to be persuasive and adopt it.").

Congress set forth the procedure for withdrawing a jurisdictional reference under the Bankruptcy Code in 28 U.S.C. § 157(d). This act states:

> *[A] district court* may withdraw, in whole or in part, any case or proceeding referred under this section, *on its own motion or on timely motion of any party*, for cause shown. *The district court shall, on timely motion of a party*, so withdraw a proceeding if the *court determines* that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

*Id.* § 157(d) (emphasis added); *accord* 9 Collier on Bankruptcy ¶ 5011.01[1], 5011-3 (rev. 15th ed. 2006) ("28 U.S.C. § 157(d) provides the authority . . . to withdraw the reference of the case or proceeding.").

In keeping with this procedure, the Supreme Court promulgated Federal Rule of Bankruptcy Procedure 5011(a), which states in its entirety:

> *A motion* for *withdrawal* of a case or proceeding shall be heard by a *district judge.*

*Id.* (emphasis added); *see also id. advisory committee note* ("[5011(a)] makes it clear that the bankruptcy judge will not conduct hearings on a withdrawal motion. The withdrawal decision is committed exclusively to the district court.").

By contrast, Local Rule 9015-2(b) establishes a very different procedure for withdrawing the district court's jurisdictional reference. Under this rule:

> If [a] *Bankruptcy Judge* determines that [a] demand was timely made and the party has a right to a jury trial, and if all parties have not filed written consent

> to a jury trial before the Bankruptcy Judge, *the Bankruptcy Judge shall certify to the District Court that the proceeding is to be tried by a jury and that the parties have not consented to a jury trial in the Bankruptcy Court. Upon such certification, [the] reference of the proceeding shall be automatically withdrawn, and the proceeding assigned to a Judge of the District Court . . . .*

Local Fed. R. Bankr. P. 9015-2(b) (emphasis added).

**[4]** After careful review we find the procedure established by Local Rule 9105-2(b) cannot be squared with the procedure established by 28 U.S.C. § 157(d), an "Act of Congress," and Rule 5011(a), a "Federal Rule of Bankruptcy Procedure." Fed. R. Bankr. Proc. 9029. At least two inconsistencies bear mentioning. First, Local Rule 9015-2(b) allows for the *bankruptcy court* to "withdraw[ ]" the jurisdictional reference, whereas 28 U.S.C. § 157(d) and Rule 5011(a) make it explicit that only a *district court* may "withdraw" the jurisdictional reference. *See FTC v. First Alliance Mortg. Co.* (*In re First Alliance Mortg. Co.*), 282 B.R. 894, 901 (C.D. Cal. 2001) (holding that "a motion [to withdrawal] is heard by *the district court*") (emphasis added). Second, Local Rule 9015-2(b) permits a party to obtain a withdrawal of the reference upon a "Motion for Certification," while 28 U.S.C. § 157(d) and Rule 5011(a) make it clear that a party may only obtain a withdrawal of the reference upon a "Motion for Withdrawal." *See Hawaiian Airlines, Inc. v. Mesa Air Group, Inc.*, 355 B.R. 214, 218 (D. Hi. 2006) (holding that "a litigant who believes that a certain [action] or portion of a [action] pending in the bankruptcy court should be litigated in the district court *may make a motion to withdraw the reference*") (emphasis added).

**[5]** We find no error then in the bankruptcy court's decision not to adhere to this invalid rule and withdraw the reference,

but instead to retain jurisdiction over the debtor's action for all pre-trial proceedings.[4]

Moreover, Sigma's citation notwithstanding, we can discern nothing in *Dunmore v. United States*, the only other case to address Local Rule 9015-2(b), which requires a different result. 358 F.3d at 1116-17. *Dunmore* was limited to discussing the basic procedure established by Rule 9015-2(b). *See id.* In other words, in that case we merely stated that if a party (1) has a right to a jury trial in the district court, (2) makes a timely demand for a jury trial in the district court, and (3) refuses to consent to a jury trial elsewhere, Local Rule 9015-2(b) requires the bankruptcy court to "automatic[ally]" "certif[y] the withdrawal of the district court's reference for 'cause shown' and sen[d] the case back to the district court." *Id.*

*Dunmore*, however, is simply unavailing to the issue we confront here: whether the procedure set forth in Local Rule 9015-2(b) is valid. This issue has never been addressed. *See Dunmore*, 358 F.3d at 1116-17. Accordingly, while *Dunmore* may be relevant for determining what procedure Local Rule 9015-2(b) sets forth, it is irrelevant for determining whether Local Rule 9015-2(b)'s procedure is valid.

## B.   Seventh Amendment Jury Trial Right

In addition to Local Rule 9015-2(b) Sigma also seeks support for its jurisdictional argument by pointing to its right to a Seventh Amendment jury trial in the district court. Sigma argues it is has been "held" that once a jury right is found, the bankruptcy court may no longer maintain "jurisdiction" and the action must be instantly transferred to an "Article III court." Sigma specifically claims this was the holding of

---

[4]Because we find Local Rule 9015-2(b) to be invalid, we express no opinion as to whether the bankruptcy court could have properly "stayed" the effective date of the Local Rule 9015-2(b) certification.

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), one of the Court's preeminent bankruptcy cases.

We agree with Sigma that it is entitled to a Seventh Amendment jury trial in the district court. *Growe v. Bilodard Inc.*, 325 B.R. 490, 491-92 (D. Me. 2005). We disagree, however, that *Granfinanciera* holds that in light of this jury trial right the bankruptcy court may no longer retain jurisdiction, and the action must be instantly transferred to an "Article III court." *See* 492 U.S. at 50, 64.

**[6]** *Granfinanciera* involved a debtor's action under § 548 of the Bankruptcy Code to recover certain allegedly "fraudulent transfers" made to two creditors. 492 U.S. at 36. In response to the action the creditors "requested a 'trial by jury.' " *Id.* at 37. The bankruptcy court, however, denied the creditors' request and held a "bench trial," which resulted in a judgment for the debtor. *Id.* The creditors filed an appeal and the Supreme Court granted cert "sole[ly]" to decide "whether [the creditors had been] entitled to a jury trial" under the Seventh Amendment. *Id.* at 38, 50. After a lengthy discussion, the Court held, these creditors, who had filed no claim of their own, had been entitled to a Seventh Amendment jury trial. *Id.* at 64 ("[We hold] . . . the Seventh Amendment entitles petitioners to the jury trial they requested.").

That the creditors had been "entitl[ed]" to a jury trial under the Seventh Amendment, however, was the exclusive holding of *Granfinanciera*. *Id.* at 64-65. In fact, the *Granfinanciera* Court explicitly stated it would hold no more. *Id.* at 50 ("We are not obliged to decide today [anything more than] . . . whether the Seventh Amendment confers on petitioners a right to a jury trial . . . ."). *Granfinanciera* does not support Sigma's argument that once a jury right is found the bankruptcy court must instantly give up jurisdiction and the case must be transferred to an Article III court. *See id.* at 64 (stating no view as to whether action may remain in bankruptcy in light of Seventh Amendment right to a jury trial).

**[7]** Instead, we find Sigma's argument to this effect is an open issue, and one of novel impression in this circuit. *E.g., City Fire Equip. Co., Inc. v. Ansul Fire Prot. Wormald U.S., Inc.*, 125 B.R. 645, 646-50 (N.D. Ala. 1989) (en banc) (finding that *Granfinanciera* did not settle whether a bankruptcy court could retain jurisdiction if there was a jury right and thus it was a novel issue).

For guidance on how to address Sigma's argument we have canvassed the numerous courts outside this circuit who have already addressed the issue. *See, e.g.*, *In re Stansbury Place, Inc.*, 13 F.3d 122, 128 (4th Cir. 1993); *Orion Pictures Corp. v. Showtime Networks* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1101-02 (2nd Cir. 1993); *King v. Fidelity Nat'l Bank*, 712 F.2d 188, 192 (5th Cir. 1983); *Growe v. Bilodard Inc.*, 325 B.R. 490, 492 (D. Me. 2005); *Plan Adm'r v. Lone Star RV Sales, Inc.* (*In re Conseco Fin. Corp.*), 324 B.R. 50, 55-56 (N.D. Ill. 2005); *Travelers Cas. & Sur. Co. v. Skinner Engine Co.* (*In re Am. Capital Equip., LLC*), 325 B.R. 372, 375 (W.D. Pa. 2005); *Hayes v. Royala, Inc.*, 180 B.R. 476, 477 (E.D. Tex. 1995); *Wittes v. Interco Inc.*, 137 B.R. 328, 329 n.2 (E.D. Mo. 1992); *Douglas, Inc. v. Watrous & Ehlers, P.C.*, 170 B.R. 169, 170 (D. Colo. 1994).

**[8]** Universally these courts have all reached the same holding, that is, a Seventh Amendment jury trial right does not mean the bankruptcy court must instantly give up jurisdiction and that the case must be transferred to the district court. *E.g., City Fire Equip. Co.*, 125 B.R. at 646-50. Instead, the bankruptcy court is permitted to retain jurisdiction over the action for pre-trial matters. *E.g., In re Stansbury Place*, 13 F.3d at 128. As these courts have explained, two rationales justify this holding.

First, allowing the bankruptcy court to retain jurisdiction over *pre-trial* matters, does not abridge a party's Seventh Amendment *right to a jury trial*. *See City Fire Equip. Co.*, 125 B.R. at 649; *accord Jobin v. Kloepfer* (*In re M & L Bus.*

*Mach. Co.*), 159 B.R. 932, 934-35 (D. Colo. 1993); *Stein v. Miller*, 158 B.R. 876, 879-80 (S.D. Fla. 1993). A bankruptcy court's pre-trial management will likely include matters of "discovery," "pre-trial conferences," and routine "motions," which obviously do not diminish a party's *right* to a jury trial. *See In re M & L Bus. Mach. Co.*, 159 B.R. at 934. Moreover, even if a bankruptcy court were to rule on a dispositive motion, it would not affect a party's Seventh Amendment *right* to a jury trial, as these motions merely address whether trial is necessary at all. *See Diamond Door Co. v. Lane-Stanton Lumber Co.*, 505 F.2d 1199, 1203 & n.6 (9th Cir. 1974) ("[S]ummary judgment is granted as a *matter of law* where there is no genuine issue of material fact, and, therefore, the province of the jury, fact finding, is not invaded.") (emphasis in original); *City Fire. Equip. Co.*, 125 B.R. at 649 ("While motions to dismiss and motions for summary judgment may be dispositive, they do not impact on the right to a *jury* trial. They merely involve legal issues as to whether *any* trial is necessary . . . . *The granting of such motions does not deprive a party of a right to a jury trial.*") (last emphasis added).

Second, requiring that an action be immediately transferred to district court simply because of a *jury trial right* would run counter to our bankruptcy system. *See In re Conseco Finance Corp.*, 324 B.R. at 55; *Eric Indus., Inc. v. Nat. Union Fire Insr. Co.* (*In re Kenai Corp.*) 136 B.R. 59, 61 (S.D.N.Y. 1992). Under our current system Congress has empowered the bankruptcy courts to "hear" Title 11 actions, and in most cases enter relevant "orders." § 157(b)(1), (c)(1); *see also In re W. Asbestos Co.*, 313 B.R. 859, 862 (N.D. Cal. 2004) (§ 157(b)(1)); *Hassett v. BancOhio Nat'l Bank* (*In re CIS Corp.*), 172 B.R. 748, 763-64 (S.D.N.Y. 1994) (§ 157(c)(1)). As has been explained before, this system promotes judicial economy and efficiency by making use of the bankruptcy court's unique knowledge of Title 11 and familiarity with the actions before them. *See, e.g.*, *City Fire Equip. Co.*, 125 B.R. at 649; *Douglas, Inc.*, 170 B.R. at 170; *Barlow & Peek, Inc.*

*v. Manke Truck Lines, Inc.*, 163 B.R. 177, 179 (D. Nev. 1993). Accordingly, if we were to require an action's *immediate* transfer to district court simply because there is *a jury trial right* we would effectively subvert this system. *In re Kenai Corp.*, 136 B.R. at 61 ("A rule that would require a district court to withdraw a reference simply because a party is entitled to a jury trial, regardless of how far along toward trial a case may be, runs counter to the policy favoring judicial economy that underlies the statutory scheme . . . ."). Only by allowing the bankruptcy court to retain jurisdiction over the action until *trial is actually ready* do we ensure that our bankruptcy system is carried out. *E.g., Disbursing Agent of Murray F. Hardesty Estate v. Severson* (*In re Hardesty*), 190 B.R. 653, 657 (D. Kan. 1995).

**[9]** We find the holding reached by the great majority of courts to have addressed this issue convincing and adopt it here. A valid right to a Seventh Amendment jury trial in the district court does not mean the bankruptcy court must instantly give up jurisdiction and that the action must be transferred to the district court. Instead, we hold, the bankruptcy court may retain jurisdiction over the action for pre-trial matters.

**[10]** The bankruptcy court here then did not err in retaining jurisdiction over pre-trial matters, despite Sigma's valid claim for a Seventh Amendment jury trial in the district court.

## II.  Summary Judgment

Having found jurisdiction to be proper in the bankruptcy court, we turn to Sigma's claim that summary judgment should not have been granted.

When reviewing a grant of summary judgment, "[o]ur task . . . is identical to that of the [bankruptcy court]." *In re Black & White Cattle Co.*, 783 F.2d 1454, 1457 (9th Cir. 1986). "We must view the evidence and inferences therefrom in the

light most favorable to the party opposing the motion for summary judgment." *Jewel Cos. v. Payless Drug Stores Northwest, Inc.*, 741 F.2d 1555, 1559 (9th Cir. 1984). We then determine whether the moving party has shown through the admissible pleadings, depositions, answers to interrogatories, and other affidavits that there is no genuine issue of material fact. *See Scheuring v. Taylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007). If this burden has been met, we must then assess whether the non-moving party has come forward with its own significant and probative evidence showing a genuine issue of material fact as to the relevant claims or defenses. *Richards v. Neilson Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).

Applying this framework here, we affirm in part and reverse in part. We affirm the bankruptcy court's grant of summary judgment on the § 547(b) claim, but we reverse the court's grant of summary judgment on the § 547(c)(2) defense.

## A. Section 547(b): Preference Payments

[11] Under the Bankruptcy Code, debtors are entitled to seek "avoidance" of a limited set of pre-bankruptcy "preference" payments. § 547(b); *Hansen v. MacDonald Meat Co.* (*In re Kemp Pac. Fisheries*), 16 F.3d 313, 315 (9th Cir. 1994). To establish that a pre-bankruptcy payment was a "preference," under § 547(b), the debtor must satisfy six elements. *Id.* (discussing six elements).

Here Sigma asserts several substantive arguments which allege that the debtor has not satisfied every element of § 574(b). *See Richards*, 810 F.2d at 902 (stating that moving party bears "initial burden" of showing that it is entitled to judgment as a matter of law on its claims or defenses).

Unfortunately, none of the arguments Sigma asserts were made in, or considered by the bankruptcy court, and therefore

we will not consider them now. *E.g., Cold Mt. v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004) ("In general, we do not consider an issue raised for the first time on appeal."). Before the bankruptcy court Sigma's only argument against the debtor's summary judgment motion on the § 547(b) claim was that the Schilling declaration was "riddled with evidentiary problems." According to Sigma, without the Schilling declaration, the debtor could not prove its § 547(b) claim. This is much different than the more substantive arguments Sigma raises now. *See supra*. As such we find these arguments were waived on appeal, and in light of the fact that Sigma does not argue any exception applies, we shall not consider them. *See Sofamor Danek Group v. Brown*, 124 F.3d 1179, 1186 n.4 (9th Cir. 1997). To the limited extent any of Sigma's other arguments were preserved, we affirm the grant of summary judgment for the reasons stated by the bankruptcy court.

**[12]** Having affirmed then the bankruptcy court's judgment that the August 8th, August 16th, and September 16th payments were preferences under § 547(b), we must answer whether Sigma raised a valid affirmative defense under § 547(c)(2). *See, e.g., Committee of Creditors Holding Unsecured Claims v. Koch Oil Co.* (*In re Powerline Oil Co.*), 59 F.3d 969, 973 (9th Cir. 1995).

## B. Section 547(c)(2): Ordinary Course of Business Defense

**[13]** In a preferential payment action, the Bankruptcy Code provides creditors with an affirmative "ordinary course of business" defense. § 547(c)(2); *see Kupetz v. Elaine Monroe Assocs., Inc.* (*In re Wolf & Vine*), 825 F.2d 197, 199 (9th Cir. 1995). This defense recognizes that "preference" payments made in the "ordinary course of business" should not be avoided. 5 Collier on Bankruptcy ¶ 547.04[2][a], 547-55 (rev. 15th ed. 2006.) (" '[T]he purpose of this [defense] is to leave undisturbed normal financial relations because it does not detract from the general policy of the preference section to

discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' " (quoting H.R. Rep. No. 595, at 373-74 (1997), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6329)). At the time of this litigation, we recognized that to establish a § 547(c)(2) defense, three distinct elements needed to be satisfied.[5] *Arrow Elecs., Inc. v. Justus* (*In re Kaypro*), 218 F.3d 1070, 1073 (9th Cir. 2000). We described them as follows:

> Under the ordinary course of business defense, § 547(c)(2), a [debtor] may not avoid a transfer to the extent the transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms.

*Gains Credit Corp. v. Anderson* (*In re Jan Willard RV, Inc.*), 315 F.3d 1192, 1197 (9th Cir. 2003). Only if each and every one of these elements was satisfied could a § 547(c)(2) "ordinary course of business defense" be successful. *See Moldy v. Chemcarb, Inc.* (*In re Food Catering & Hous., Inc.*), 971 F.2d 396 (9th Cir. 1992).

Sigma argues the bankruptcy court erred in granting summary judgment in favor of the debtor as to its § 547(c)(2)

---

[5]We recognize that in 2005 Congress amended § 547(c)(2), making it arguably even easier to prove. Pub. L. No. 109-8, § 409 (2005); *see Wood v. Stratos Prod. Dev., LLC.* (*In re Ahaza SYS., Inc.*) 482 F.3d 1118, 1123 n.4 (9th Cir. 2007). As amended § 547(c)(2) now only requires satisfaction of two elements (1) that the transfer was "in payment of a debt incurred by the debtor in the ordinary course of business" and (2) that the payment was either "made in the ordinary course of business" *or* "made according to ordinary business terms." § 547(c)(2) (emphasis added). Because this litigation arose prior to the 2005 amendment, however, the pre-2005 version of § 547(c)(2) still governs. *See Frankfort Digital Servs. v. Costlier* (*In re Reynosa*), 477 F.3d 1117, 1120 n.1 (9th Cir. 2007).

defense. Sigma claims, despite the bankruptcy court's holding, it did establish a genuine issue of fact as to whether the three payments were (1) made in the ordinary course of business of the debtor and the transferee (§ 547(c)(2)(B)) and (2) made according to ordinary business terms (§ 547(c)(2)(C)). As such, Sigma explains, because the bankruptcy court already found it satisfied § 547(c)(2)(A), summary judgment must be reversed.

We agree.

### 1. Section 547(c)(2)(B)

[14] In this circuit the rules associated with § 547(c)(2)(B) are well-settled. *See In re Ahaza Sys., Inc.*, 482 F.3d at 1124. To satisfy § 547(c)(2)(B) the creditor must demonstrate that the relevant payments were "ordinary in relation to past practices between the debtor and [the] . . . creditor." *In re Food Catering & Hous., Inc.*, 971 F.2d at 398. Effectively this breaks down into two components. First, the creditor must show a baseline of past practices between itself and the debtor. *See id.*; 5 Collier on Bankruptcy ¶ 547.04[2][a], 547-60 (rev. 15th ed. 2006.). Second the creditor must show that the relevant payments were "ordinary in relation to [these] past practices." *In re Food Catering & Hous., Inc.*, 971 F.2d at 398. This is most commonly done by demonstrating that the relevant payments did not differ from past payments in "amount" or "form," were not the result of "unusual collection or payment activit[ies]," or did not come as a result of the "creditor [taking] advantage of the debtor's deteriorating financial condition." *Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 732 (9th Cir. 1994). *But see In re Ahaza*, *Inc.*, 482 F.3d at 1129 (finding that traditional factors are non-exclusive and other factors bearing on past practices may be relevant).

[15] Here we believe Sigma has at least raised a triable issue of fact as to whether § 574(c)(2)(B) has been satisfied,

for it has offered evidence on both components. *See In re Grand Chevrolet*, 25 F.3d at 732-33.

**[16]** First, the Backof declaration tends to show a baseline of past practices between the debtor and Sigma. According to Backof, Sigma and the debtor entered into an agreement in January 1998. From that date, until March 2001, Sigma and the debtor engaged in a routine "payment cycle." Sigma would submit invoices for its maintenance and support services, and the debtor would pay the invoices by check, from oldest to newest. "The invoices paid by the debtor ranged from between 16 and 105 days" from the date the invoice was received, with an average of 65.72 days. As Backof stated, this was "the ordinary course of business between the debtor and Sigma."

**[17]** Second, the Backof declaration also tends to show that the August 8th, August 16th, and September 16th payments were ordinary in relation to these past practices. Each of the three payments was consistent with prior payment "forms," that is, they each were done by check, and were attached to a specific Sigma invoice. The three payments also conformed to the debtor and Sigma's prior "payment cycle." The August 8th payment paid invoices 90 days old. The August 16th payment paid invoices between 63 and 83 days old. And the September 16th payment paid invoices between 16 and 78 days old. Lastly, Backof did not mention that the three payments "came as a result of [Sigma] tak[ing] advantage of the debtor's deteriorating financial conditions." In sum, according to Backof, each of these payments "was made within the ordinary course of business of Sigma Micro Corporation and the debtor."

**[18]** Based on this evidence we hold that Sigma at least raised a triable issue of fact as to whether § 547(c)(2)(B) was satisfied.

Furthermore, we reject the bankruptcy court's position that the debtor's institution of an "old school" weekly cash-flow

management system prohibited Sigma from satisfying § 547(c)(2)(B). Even if this system was "out-dated" it does not follow that we must hold that the three payments did not satisfy § 547(c)(2)(B). *See In re Kaypro*, 218 F.3d at 1073 ("[T]he bankruptcy court erred in holding that payments made pursuant to a restructuring agreement are *per se* outside the ordinary course of business . . . ."). When determining whether § 547(c)(2)(B) has been satisfied, no one factor is conclusive. *See In re Ahaza*, *Inc.*, 482 F.3d at 1129. On the contrary, all evidence shedding light on the practices between the parties, past and present, should be considered. *See Schoenmann v. BCCI Constr. Co.* (*In re Northpoint Commc'ns Group, Inc.*), 361 B.R. 149, 158 (Bankr. N.D. Cal. 2007). By focusing only on the "old school" weekly cash-flow management system, the bankruptcy court failed to take account of all the other evidence in the Backof declaration raising a genuine issue as to whether § 547(c)(2)(B) had been satisfied.

### 2. Section 547(c)(2)(C): Ordinary Business Terms

[19] In this circuit, the rules attending § 547(c)(2)(C) are also well-settled. *See In re Jan Willard RV, Inc.*, 315 F.3d at 1197-98. To satisfy § 547(c)(2)(C) the creditor must demonstrate that the relevant payments were "ordinary in relation to prevailing business terms." *In re Food Catering & Hous., Inc.*, 971 F.2d 396, 398 (9th Cir. 1992). As before, this effectively breaks down into two components. First the creditor must establish the "broad range" of business terms employed by similarly situated debtors and creditors, including those in financial distress, during the relevant period. *In re Jan Willard RV, Inc.*, 315 F.3d at 1197-98. Second, the creditor must show that the relevant payments were "ordinary in relation to [these] prevailing business terms." *See In re Kaypro*, 218 F.3d at 1074. In general, § 547(c)(2)(C) should not pose a particularly high burden for creditors. *See In re Jan Willard RV, Inc.*, 315 F.3d at 1198 (holding only payments which are so

unusual as to be "aberration[s] in the relevant industry" do not satisfy § 547(c)(2)(C)).

Here we yet again believe that Sigma has at least raised a triable issue of fact as to whether § 547(c)(2)(C) has been satisfied, for it has offered evidence on both components.

First, the Backof declaration does include evidence pertaining to the business terms used by other debtors and creditors in the "industry." Backof states that in preparation for her declaration she reviewed "industry-wide payment data prepared by NACM," including the payment history "of all customers of all reporting companies." According to this data, for the period of June 2001 to October 2001, the "industry" standard was to pay invoices between 23 to 100 days after the billing date. In other words, the "broad range" of business terms for other "industry" participants was to pay invoices anywhere from 23 to 100 days after the invoice was received.

**[20]** Second, the Backof declaration also includes evidence showing that the August 8th, August 16th, and September 16th payments were "ordinary in relation to [these] prevailing business standards." As noted above, the August 8th payment paid invoices 90 days old. The August 16th payment paid invoices between 63 and 83 days old. And the September 16th payment paid invoices between 16 and 78 days old. As Backof stated then, each of these payments was made "according to [the] ordinary business terms." Indeed, none were so unusual as to be "aberrations" in the "industry." *See In re Jan Willard RV, Inc.*, 315 F.3d at 1198.

**[21]** Based on this evidence we hold that Sigma at least raised a triable issue of fact as to whether § 547(c)(2)(C) was satisfied.

Moreover we reject the bankruptcy court's position that Sigma failed to satisfy § 547(c)(2)(C) because Backof did not adequately define what "industry" she was referring to. Back-

of's declaration states she obtained "industry" information from NACM, which included "industry-wide" payment history for "all customers of all reporting companies." Admittedly, Backof's declaration is far from perfect. *In re Jan Willard RV, Inc.*, 315 F.3d at 1198 (stating that creditor must establish business terms used by "similarly situated" debtors and creditors). At this point, however, we are required to "view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of that party." *Welles v. Turner Entm't Co.*, 488 F.3d 1178, 1183 (9th Cir. 2007). Under this standard, we think Backof's declaration, which states that the three payments were ordinary for the "industry" was sufficient to create a triable issue of fact as to whether § 547(c)(2)(C) was satisfied. *Cf. In re Deltacorp, Inc.,* 179 B.R. 773, 781 (Bankr. S.D.N.Y. 1995) (holding that § 547(c)(2) defense should rarely be decided "on a motion for summary judgment, given [its] peculiarly factual nature").

## CONCLUSION

For all the foregoing reasons we AFFIRM in part, REVERSE in part, and REMAND.